*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MIGUEL MANSOUR,

        Defendant-Appellant.

UNPUBLISHED
November 10, 2022

No. 356072
Macomb Circuit Court
LC No. 2019-002347-FC

Before: RIORDAN, P.J., and BOONSTRA and GADOLA, JJ.

PER CURIAM.

Defendant appeals by right his guilty but mentally ill conviction, MCL 768.36, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a), for which the trial court sentenced him to life imprisonment without parole. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's conviction arises from the fatal stabbing of Michael Shereda in Grant Park in Utica on September 1, 2018.[1] On that day, Shereda and his girlfriend, Debra Zoppi, and her family were celebrating Zoppi's granddaughter's first birthday at a pavilion in the park. Zoppi took her granddaughter for a walk around the park, where she observed defendant sitting on a bench inhaling a substance from silver cannisters.[2] Zoppi alerted Shereda to defendant's presence because defendant appeared to be getting high. Shereda approached defendant, intending to tell him to "move on." Numerous witnesses testified that within seconds of Shereda approaching defendant, defendant attacked Shereda, stabbing him numerous times. Defendant ignored pleas from bystanders to stop, but immediately stopped his attack and dropped his knife when confronted

---

[1] The medical examiner testified that Shereda died from multiple stab and incised wounds.

[2] Police officers determined that the cannisters contained nitrous oxide. These cannisters are known as "whippets" and their contents can be inhaled for their intoxicating effect. See *People v Wood*, 321 Mich App 415, 418 & n 1; 910 NW2d 364 (2017), rev'd on other grounds 503 Mich 981 (2019).

-1-

by the police. At trial, defendant asserted that he was not guilty because he was legally insane at the time of the offense. Defendant presented two experts, Dr. Jennifer Whitmore and Dr. Steven Miller, who both opined that defendant was legally insane at the time of the killing. The defense experts testified to interviews with defendant in which he had professed a belief in a government conspiracy involving other-worldly aliens and had stated that he believed Shereda was an alien whom he had been commanded to kill. The prosecution argued that defendant may have suffered from a mental illness, but that he was not legally insane at the time of the offense and that he attacked Shereda because he was enraged that Shereda had confronted him. The jury rejected defendant's claim of insanity and found him guilty but mentally ill of first-degree premeditated murder. The trial court denied defendant's post-conviction motion for a new trial, in which he raised the same issues that he now raises on appeal. This appeal followed.

## II. PROSECUTORIAL MISCONDUCT[3]

Defendant argues that the prosecution conducted itself in a manner that denied him a fair trial and that defense counsel was ineffective for failing to object to all of the prosecution's conduct. We disagree.

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). As defendant acknowledges, defendant objected to "a portion" of the prosecution's questions during cross-examination. Therefore, these claims are preserved. However, the majority of his claims of prosecutorial misconduct are unpreserved. We review preserved claims of prosecutorial misconduct case by case by examining the challenged conduct in context to determine whether the defendant received a fair and impartial trial. *People v Brown*, 294 Mich App 377, 382-383; 811 NW2d 531 (2011). Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting defendant's substantial rights. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). We will not reverse if the alleged prejudicial effect of the prosecutor's conduct could have been cured by a timely instruction. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

Preliminarily, defendant's overriding claim is that the prosecution's conduct in this case was similar to the prosecutor's conduct in *People v Evans*, 335 Mich App 76; 966 NW2d 402 (2020), which this Court held required reversal. We disagree.

In *Evans*, this Court concluded that the prosecution repeatedly transgressed the "well-established boundaries" of cross-examination during the prosecution's cross-examination of the defense experts, thereby denying the defendant a fair trial. *Id*. at 79. The Court observed that the prosecution: (1) "repeatedly and gratuitously disparaged [the expert's] qualifications and her

---

[3] This Court has noted that the term "prosecutorial misconduct" has often been used to encompass claims of inadvertent error that are more fairly presented as "prosecutorial error." See *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Here, some of defendant's claims of error allege actions that rise to the level of deliberate misconduct, while others allege conduct more fairly presented as inadvertent error. For simplicity, we will use the umbrella term "prosecutorial misconduct" to refer to all of these claims.

intelligence"; (2) "inaccurately characterized [her] opinions in a sarcastic, mocking, and inaccurate manner" in order "to generate the jury's scorn rather than to shed light on the issues presented by the evidence"; (3) "repeatedly accused [the expert] in a badgering fashion of deliberately ignoring or withholding evidence from the jury," and (4) "accused [the expert] of being unable to distinguish 'right from wrong.' " *Id*. at 93. This Court noted that "[n]o evidence underlay these attacks." *Id*. Specific examples included the prosecution equating the expert to the cartoon character "Lucy" from the Peanuts comic strip, offering to "write [his question] out in Crayon" so the expert could understand it, and insisting that the expert's refusal to opine about the defendant's sanity after the murder was "hypocrisy." *Id*. at 95, 99, 101. This Court described the prosecution's cross-examination as "brutal and improper." *Id*. at 105.

We have reviewed the prosecution's questions and commentary in this case, and they simply do not rise to the offensive and aggressive level that supported a finding of misconduct in *Evans*. There is nothing about the prosecution's conduct in this case that is comparatively disparaging or sarcastic to the cross-examination or commentary used in *Evans*. As defendant notes, the prosecution did refer to the defense experts as "shrinks." We agree with the trial court that this term was not a necessarily mocking and disparaging reference, nor did it rise to the level of a cartoonish depiction. Rather, as the court observed, the term is a known colloquialism for mental health professionals. Moreover, the prosecution used this colloquialism only once, during its opening statement, and subsequently referred to the experts on multiple other occasions as psychologists. Defendant has not demonstrated that the prosecution's single use of the term "shrinks" during opening statement denied him a fair trial. *Roscoe*, 303 Mich App at 648.

Regarding cross-examination, defendant argues that the prosecution engaged in misconduct by questioning his experts in a manner that suggested that their conclusions that defendant was legally insane were based only on defendant's statements that he made to them, and that defendant could have been manipulative in making statements to support that he was insane. Defendant provides page citations to the record, but he does not indicate which specific questions he believes were improper. According to the record citations provided by defendant, the following exchanges occurred during the prosecution's cross-examination of Dr. Whitmore:

> *Q*. I mean every time I point out maybe a slight difference, you say if that is what he said, and if it is accurate.
>
> My question to you is how important when you interview him, is his accuracy in answers to you.
>
> *A*. I collect information from a variety of sources. I don't—
>
> Self report is important, but I also look to see how consistent it is with other information. I guess from other sources like police, family , and hospital records.
>
> \* \* \*
>
> *Q*. Do you mostly go on what the patient tells you. [sic].
>
> *A*. That is a part of the evaluation, but it always important to have collateral or corroborating information. Obviously a person with severe mental illness has

their own specific symptoms that they experience in a certain way. And it is virtually impossible for anyone else to know what is going on in someone's mind at all moments.

So you rely on their self report for these inner experiences. But then I also see how that lines up against your knowledge of what legitimate mental illness looks like, the pattern of legitimate mental illness and what others are observing.

If someone is saying they are having severe symptoms and everyone else they look great to me, that is really questionable. Or if someone says I'm doing great, and then the family reports a bunch of bizarre things that are occurring, then you see inconsistency.

\* \* \*

*Q*. But you certainly spent a lot of space talking about the statement he makes to you in that previous evaluation and you give just the one word paranoid from the police report set of facts.

So again it weighed unevenly from, I see in the report the jury is going to see it themselves. You have one word up here and all this down here is what he told you.

So you weighed even for the secondary report what was more important and put in what he told you is more important.

*A*. I provided a summary of the data I thought was relevant to this homicide evaluation.

Regarding Dr. Miller, defendant provides a citation to the record that contains the following exchange:

*Q*. When we go to the foundation of all of this information we, go to what he decides to say and what he decides not to say?

*Defense counsel*: Your Honor, that is argumentative.

*The prosecutor*: It is.

*The court*: It is a question.

*A*. Do we rely on what the defendant tells us.

*Q*. Right.

*A*. To make a determination of mental illness and insanity, yes.

"Vigorous and searching cross-examination is a powerful instrument for the ascertainment of truth," particularly in undermining the credibility of a witness or exposing frailties in a witness's

recitation of the pertinent events. *Evans*, 335 Mich App at 90. Therefore, "it is appropriate that cross-examiners be afforded wide latitude to do their job." *Id*. Further,

> "[o]ne of the elementary principles of cross-examination is that the party having the right to cross-examine has a right to draw out from the witness and lay before the jury anything tending or which may tend to contradict, weaken, modify or explain the testimony of the witness on direct examination or which tends or may tend to elucidate the testimony or affect the credibility of the witness." [*Id*. (citation omitted).]

"Effective and probing cross-examination of expert witnesses is particularly important in criminal cases when expert testimony plays a pivotal role." *Id*. However, "[a] defendant's opportunity for a fair trial can be jeopardized when the prosecutor injects issues broader than the defendant's guilt or innocence." *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007).

We agree with the trial court that the prosecution was permitted to challenge the information that the defense experts relied on in concluding that defendant was legally insane. Both witnesses testified that defendant's self-report informed their ultimate conclusion. When questioning the witnesses, the prosecution used specific examples of when defendant's statements changed over time or were inconsistent with other information. Defendant does not explain why the prosecution should have been prohibited from drawing out from the experts that they relied on defendant's self-reporting, which the evidence showed was not always consistent with his own prior statements or other evidence, in order to weaken their conclusion that he was legally insane. Indeed, this is the very purpose of cross-examination. *Evans*, 335 Mich App at 90.

The same holds true for defendant's claim that, during cross-examination, the prosecution improperly stated that the experts had ignored certain information from police reports about this case and a prior home invasion involving defendant, and had ignored prior conclusions from other mental health professionals who had examined defendant before this incident. The prosecution questioned the experts about their consideration, or lack thereof, of defendant's prior actions and defendant's history of aggressive responses when he felt challenged. The prosecution also inquired into whether defendant had mentioned aliens in the prior attacks. This evidence was discussed at trial, and both doctors explained how they reached their conclusions and how they decided what to include in their reports. Defendant has not explained why the prosecution should have been prohibited from questioning the experts about what they chose to include in their reports or considered when reaching their conclusions, and why they did not consider other available information. Defendant's claimed insanity at the time of the offense was the crux of this case, and probing cross-examination, on the basis of the evidence, of the defense experts who concluded that defendant was legally insane was crucial. See *Evans*, 335 Mich App at 90. Because this evidence, which was properly drawn out during cross-examination, was not improper, the prosecution could properly refer to it during closing argument to urge the jury to reject the opinions of the defense experts and conclude that defendant was not legally insane at the time of the offense. The prosecution may argue the evidence and all reasonable inferences that arise from the evidence in relationship to their theory of the case, and they need not state their inferences in the blandest possible language. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *Dobek*, 274 Mich App at 66.

Defendant also argues that the prosecution misstated the law during closing argument by suggesting that a person cannot be legally insane if he was only temporarily insane at the time of the offense. We disagree with that characterization of the prosecution's comments.

Defendant challenges these specific statements by the prosecution during closing arguments:

> Second, the Defendant has proven by a preponderance of the evidence that he was mentally ill at the time, and defined term for you at the time of the crime.

> We have never doubted that he is mentally ill. I agree with Dr. Whitmore and with Dr. Miller on all of those substantial factors that go into the fact that he was delusional, though I have to disagree with Dr. Miller. I don't understand insanity from his point. He is telling you that you can jump in and out of insanity. You can be insane for this and then no, I'm not insane. That is not how this works. That is not how any of this works.

> If I borrow the Geico commercial that is not insanity, it is not that simple.

"A prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial." *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002), lv den 468 Mich 856 (2003). Here, however, the prosecution, when making the challenged comments, was bringing the jury's attention to defendant's decision-making and changes in his behavior at certain times. For example, shortly after making the challenged remarks, the prosecution mentioned the examples of when defendant "is normal" and then changed his behavior when he wanted something. The prosecution did not state that the jury could not find that defendant was insane at the time of the offense if it determined that he was only temporarily insane; rather, the prosecution merely argued from the evidence that defendant was acting in a deliberately manipulative, rather than insane, manner.

Moreover, to the extent that the prosecution's argument could be perceived as improper, an erroneous legal argument can be cured if the jury is correctly instructed on the law. *Id*. at 357. In this case, before the presentation of any evidence, the trial court instructed the jury that the court was responsible for instructing it on the law, and that the jury must accept the law as given to it by the court. After closing arguments, in its final instructions, the trial court instructed the jury that the lawyers' comments are not evidence, and reminded the jurors of their oath to return "a true and just verdict based only on the evidence and [the court's] instructions on the law." The court also instructed, "It is my duty to instruct you on the law. You must take the law as I give it to you. If a lawyer says something different about the law, follow what I say." The court reiterated, "your job is . . . to apply the law as I give it to you[.]" The court thereafter accurately instructed the jury on legal insanity. Defendant does not dispute that the trial court properly instructed the jury in this regard. Jurors are presumed to have followed their instructions, *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011), and defendant has not provided any basis for concluding that the jurors failed to do so in this case.

Defendant also lists several other comments or words used by the prosecution that he contends require reversal, but does not provide any analysis of the allegedly prejudicial effect of

the challenged statements. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). In any event, as observed by the trial court, the trial court instructed the jury that the lawyers' questions, statements and arguments are not evidence, that the jurors are the sole judges of witness credibility, and that the jury was to follow the court's instructions. The trial court's instructions were sufficient to dispel any possible prejudice and to protect defendant's substantial rights. *Breidenbach*, 489 Mich at 13; *People v Long*, 246 Mich App 582, 588; 633 NW2d 843 (2001).

Defendant also argues that defense counsel was ineffective for failing to object to all of the prosecutor's questions and commentary. Because we find no prosecutorial misconduct warranting reversal occurred, defense counsel's failure to object was not objectively unreasonable. Failure to advance a "futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that defense counsel was ineffective by referring to a verdict of guilty but mentally ill as a "compromise" during closing argument. We disagree.

"Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). "To demonstrate ineffective assistance of trial counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013) (citation omitted). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. The effective assistance of counsel is presumed, and defendant bears the burden of showing deficient conduct and the resulting prejudice. *Roscoe*, 303 Mich App at 644. "Reviewing courts are not only required to give counsel the benefit of the doubt with this presumption, they are required to 'affirmatively entertain the range of possible' reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012) (citation omitted), vacated in part on other grounds 493 Mich 864 (2012). "[A] reviewing court must conclude that the act or omission of the defendant's trial counsel fell within the range of reasonable professional conduct if, after affirmatively entertaining the range of possible reasons for the act or omission under the facts known to the reviewing court, there might have been a legitimate strategic reason for the act or omission." *Id*. at 22-23. The defendant has the burden of establishing the factual predicate of his ineffective-assistance-of-counsel claim. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

Defendant argues that the emphasized statement in defense counsel's closing argument constituted ineffective assistance of counsel:

> Now you will reach a verdict. The Court will give you a verdict form and they will go through the possible verdicts, guilty of murder one, not guilty of murder one, not guilty by reason of insanity.

*You can also find him guilty but mentally ill on murder one, as well as murder two and manslaughter. I'm not asking you to consider guilty but mentally ill. It's a compromise.* If I have proven that he has a mental illness at the time of the offense which I have, I have sufficiently proven to you that he was insane at the time. I have submitted objective evidence. Doctor testimony, historical evidence, evidence of the act itself. Interpret those with the presumption of innocence in mind. Make the prosecution first prove their case beyond a reasonable doubt, then look at my evidence. When you look at my evidence it is supported by everything, by the history, by the doctors, by the act itself. What took place before the incident. What took place during the incident. What took place after the incident. All the interviews all point conclusively to a verdict of not guilty by reason of insanity.

\* \* \*

Look at all the evidence. After you looked at all the evidence, the verdict can only be not guilty by reason of insanity. Thank you. [Emphasis added.]

Defendant has not overcome the strong presumption that defense counsel's reference to a verdict of guilty but mentally ill as a "compromise" was strategic. Defense counsel did not ask the jury to return a verdict of guilty but mentally ill, but argued that, on the basis of the evidence, the verdict should be not guilty by reason of insanity. Therefore, defendant's contention that defense counsel somehow argued for a compromise verdict or admitted defendant's guilt is inaccurate. Further, viewing defense counsel's use of the term "compromise" in context, it is apparent that defense counsel did not mischaracterize a verdict of guilty but mentally ill "as a lesser offense" or "suggest[] the possibility of lesser punishment." Rather, defense counsel urged the jury *not* to return a verdict of guilty but mentally ill because the defense had "sufficiently proven to [the jury] that [defendant] was insane at the time." Defense counsel then discussed the evidence that the defense had presented at trial to support a verdict of guilty by reason of insanity. In sum, counsel reasonably chose to discuss the evidence supporting the defense theory and in fact urged the jury not to compromise and return a verdict of guilty but mentally ill because the defense had proven its case. Decisions regarding how to argue are presumed to be matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Foster*, 319 Mich App 365, 391; 901 NW2d 127 (2017) (quotation marks and citation omitted). "The fact that trial counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). Defendant was not established that defense counsel's conduct was objectively unreasonable or prejudiced the proceedings against him.

## IV. GREAT WEIGHT OF THE EVIDENCE

Defendant also argues that he is entitled to a new trial because the great weight of the evidence showed that he was legally insane at the time of the killing. We disagree.

A new trial may be granted if a verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e). We review for an abuse of discretion a trial court's decision denying a motion for a new trial on the grounds that the verdict was against the great weight of the evidence.

-8-

*People v Abraham*, 256 Mich App 265, 269; 662 NW2d 836 (2003). In evaluating whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998); *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). A verdict may be vacated only when it "does not find reasonable support in the evidence, but is more likely to be attributed to causes outside the record such as passion, prejudice, sympathy, or some extraneous influence." *People v DeLisle*, 202 Mich App 658, 661; 509 NW2d 885 (1993) (citation omitted). Absent compelling circumstances, the credibility of witnesses is for the jury to determine. See *Lemmon*, 456 Mich at 642-643.

The prosecution's theory at trial was that defendant was not legally insane at the time he killed Shereda. A defendant is guilty of first-degree murder if it determined, beyond a reasonable doubt, that he committed a "willful, deliberate, and premeditated killing." MCL 750.316(1)(a). Defendant does not challenge the elements of first-degree premeditated murder, only the jury's rejection of his affirmative defense that he was legally insane at the time of the murder. MCL 768.21a(1) states, in relevant part:

> [i]t is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or having an intellectual disability does not otherwise constitute a defense of legal insanity.

Defendant's principal argument is that the jury's verdict is against the great weight of the evidence because the defense presented two experts who opined that he was legally insane at the time of the offense, whereas the prosecution failed to introduce any experts or otherwise effectively challenge the defense experts' conclusions regarding defendant's mental state. However, as observed by the trial court, defendant had the burden of proving his insanity defense by a preponderance of the evidence, MCL 768.21a(3), and "[t]he prosecutor was not required to present any evidence" on the matter. *Evans*, 335 Mich App at 85-86. "And 'if a defendant produces sufficient evidence of the elements of [an affirmative] defense, then the question whether the defendant has asserted a valid defense is for the jury to decide.'" *Id.* at 86 (citation omitted). Therefore, "the prosecution's failure to put forward expert testimony did not render the evidence supporting [the defendant's] sanity insufficient as a matter of law." *Id.*

Additionally, defendant's great-weight argument also focuses on his expert witnesses' credibility. Questions regarding the credibility of witnesses, however, are not sufficient grounds for granting a new trial. *Lemmon*, 456 Mich at 643. Moreover, "a jury is entitled to disbelieve an expert witness's testimony, even though the testimony is unrebutted or uncontradicted by other expert testimony." *Evans*, 335 Mich App at 86 (citation omitted). Here, the prosecution did challenge the conclusions of defendant's experts during cross-examination, as discussed in Part II of this opinion.

A reviewing court should ordinarily defer to the jury's determination of credibility "unless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities[.]" *Lemmon*, 456 Mich at 644-646 (citation omitted). That is not the case here. The fact that defendant disagrees with the jury's weighing of his experts' conclusions does not warrant the unusual step of overriding the jury's credibility determination. It was up to the jury to assess the weight and reliability of the defense experts. The evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. Accordingly, the jury's verdict is not against the great weight of the evidence and defendant is not entitled to a new trial on this basis. *Id*. at 627.

## V. CUMULATIVE ERROR

Defendant also argues that the cumulative effect of the prosecution's conduct and defense counsel's errors previously discussed in this opinion requires reversal. We disagree. We review a claim of cumulative error to determine whether a combination of errors denied the defendant a fair trial. *Dobek*, 274 Mich App at 106. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal," but this Court will not grant a new trial unless the cumulative effect of such errors "undermine[s] the confidence in the reliability of the verdict." *Id*. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Id*.

We have rejected defendant's claims of prosecutorial misconduct and ineffective assistance of counsel. Because defendant has not identified any error, let alone several errors, that undermined the reliability of the verdict, there can be no cumulative effect of errors requiring reversal. *Id*.

## VI. MANDATORY LIFE SENTENCE

Regarding his sentence of life without parole (LWOP), defendant argues that, given the verdict of guilty but mentally ill, the imposition of the statutory LWOP sentence violates both US Const, Am VIII, and Const 1963, art 1, § 16, because the mitigating factor of mental illness was not considered. We disagree. We review constitutional issues de novo. *People v Harris*, 499 Mich 332, 342; 885 NW2d 832 (2016).

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16,[4] whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII.[5]" *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (citation and quotation marks omitted). Whether a penalty or sentence imposed

---

[4] The Michigan Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" Const 1963, art 1, § 16.

[5] The United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII.

against a defendant can be considered cruel or unusual is to be determined by a three-pronged test including: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states." *Id.* (citation omitted).

The Legislature has mandated a sentence of LWOP for adult offenders who commit the crime of first-degree murder. MCL 750.316. In *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976), our Supreme Court upheld the LWOP sentence mandated by MCL 750.316 for felony murder, under both the United States and Michigan Constitutions. The Court expressly rejected the defendant's assertions that a mandatory life sentence under MCL 750.316 violates US Const, Am VIII, prohibiting "cruel and unusual" punishment, and Const 1963, art 1, § 16, forbidding "cruel or unusual" punishment. The Court found that "the punishment exacted is proportionate to the crime," that no indication existed that "Michigan's punishment is widely divergent from any sister jurisdiction," and that the sentence served the Legislature's permissible goal to deter similar conduct by others. *Hall*, 396 Mich at 658. "Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). "[A] proportionate sentence does not constitute cruel or unusual punishment." *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008).

Defendant acknowledges that neither the United States Supreme Court nor the Michigan Supreme Court has held that a mandatory life sentence for those defendants found guilty but mentally ill of first-degree murder violates the prohibition on cruel or unusual (or cruel and unusual) punishment. Further, MCL 768.36(3), which addresses sentencing for a defendant who has been found guilty but mentally ill, states, in relevant part:

> (3) If a defendant is found guilty but mentally ill or enters a plea to that effect which is accepted by the court, *the court shall impose any sentence that could be imposed by law upon a defendant who is convicted of the same offense*. If the defendant is committed to the custody of the department of corrections, the defendant shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his or her mental illness or intellectual disability. [Emphasis added.]

Therefore, the Legislature has mandated a sentence of LWOP for adult offenders who commit the crime of first-degree murder, and has mandated that a trial court impose upon a defendant found guilty but mentally ill any sentence that could have been imposed upon a defendant found guilty of the same offense. Accordingly, the verdict of guilty but mentally ill did not entitle defendant to any special sentencing consideration (but does allow him to obtain treatment during his incarceration). Further, our Supreme Court has held that "[t]hrough [MCL 768.36(3)], the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity *cannot be used to* avoid or *reduce criminal responsibility* by negating specific intent." *People v Carpenter*, 464 Mich 223, 237; 627 NW2d 276 (2001) (emphasis added). Defendant's argument that the verdict of guilty but mentally ill makes him "less culpable" than a

-11-

defendant without a mental illness, and therefore the trial court should have considered his mental illness as a mitigating factor, is without any basis in law.  For these reasons, we reject defendant's argument that his sentence is unconstitutionally cruel or unusual.

Affirmed.

/s/ Michael J. Riordan
/s/ Mark T. Boonstra
/s/ Michael F. Gadola