*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MAURICE DARNELL ELLIOT, JR.,

        Defendant-Appellant.

UNPUBLISHED
June 13, 2024

No. 361969
Wayne Circuit Court
LC No. 18-000776-01-FC

Before: MURRAY, P.J., and RIORDAN and D. H. SAWYER*, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, third-degree killing or torture of an animal, MCL 750.50b(5), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life imprisonment without parole for the felony-murder conviction, 18 to 40 years' imprisonment for the armed robbery conviction, and 12 months for the killing or torture of an animal conviction, to be served concurrently, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Defendant's convictions arise from the shooting death of Clarence Reynolds and the killing of Reynolds's dog during the commission of a robbery. The police discovered Reynolds's body in the doorway of his home on December 28, 2017. The medical examiner determined that he died from a close-range gunshot wound to the head. Reynolds was a known marijuana seller. Inside Reynolds's house, the police discovered that one of Reynolds's dogs had been shot in the face and killed. Reynolds's vehicle, a Dodge Caravan, was missing from his home. The vehicle was found the next day at another Detroit location, fully engulfed in flames.

After the police obtained Reynolds's cell phone records, they discovered that, after Reynolds's reported death, several calls were made by Reynolds's phone to a number associated with Armonee Felder. The police investigated Felder, defendant's longtime friend, who reported that later in the day on December 28, defendant called him several times from a phone number that

---

\* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

Felder did not recognize and then visited Felder later that day. When defendant was asked about his phone, he remarked "watch the news" and then said that he "caught a body," which Felder understood to mean that defendant had killed someone. Defendant also stated that he had stolen a few dollars and some marijuana from the man he killed, and had taken the man's van, which he had driven to Felder's house. Felder had previously accompanied defendant to Reynolds's house when defendant bought marijuana there.

Lorenzo McCray testified that in January 2018, he and defendant were detained together in the Detroit Detention Center and were discussing the crimes for which they were being detained. According to McCray, defendant said he was being detained for a homicide and admitted that he committed the crime. Defendant also remarked that the police did not have any evidence against him, except for him using "a dead man's phone." Defendant also said something about a car being burned.

Defendant was originally convicted of the same offenses in March 2018. In a prior appeal, this Court held that the trial court's questioning of (Felder), a key prosecution witness, pierced the veil of judicial impartiality and denied defendant a fair trial. *People v Elliot*, unpublished per curiam opinion of the Court of Appeals, issued March 5, 2020 (Docket No. 344740), p 8. Therefore, this Court reversed defendant's convictions and remanded for a new trial before a different judge. *Id.* at 10.

At defendant's second trial, in March 2022, the trial court determined that Felder was unavailable because the prosecution was unable to locate and produce him, despite the exercise of due diligence. Accordingly, the court permitted the prosecution to introduce a redacted version of Felder's prior testimony from defendant's first trial. Defendant testified at his second trial and denied committing the charged crimes. Indeed, defendant denied knowing Reynolds or knowing that anyone who lived at his house sold marijuana. Defendant admitting calling Felder from Reynolds's phone, but claimed that he found the phone on the street. On cross-examination, the prosecution impeached defendant's testimony with defendant's statements made during a prior recorded police interview in which defendant admitted knowing Reynolds and knowing that Reynolds's house was a drug house, and that he had previously purchased marijuana from Reynolds. The jury again found defendant guilty of all offenses as charged.

## II. RIGHT TO 12 JURORS

Defendant argues that reversal is required because the verdict was returned by only an 11-person jury, after one of the jurors was excused because of a medical condition. We disagree.

Defendant concedes that this issue is unpreserved because there was no objection to allowing the jury to continue deliberations with only 11 jurors after one of the jurors was excused and the prosecutor and defense counsel stipulated to accepting a verdict from an 11-person jury. *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022). This Court reviews questions of constitutional law de novo. *People v Parks*, 510 Mich 225, 245; 987 NW2d 161 (2022). But unpreserved claims of constitutional error are reviewed for plain error affecting defendant's substantial rights. *Anderson*, 341 Mich App at 279. As explained in *Anderson*:

Under the plain-error rule, defendant bears the burden to prove (1) an error occurred, (2) the error "was plain, i.e., clear or obvious," and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings. If defendant satisfies those three requirements, we must make a fourth determination: whether the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence. [*Id*. at 279-280 (citations omitted).]

A defendant in a criminal felony proceeding is entitled to a jury of 12 jurors and a criminal verdict must be unanimous. Const 1963, art 1, § 20; *People v Cooks*, 446 Mich 503, 510-511; 521 NW2d 275 (1994). MCR 6.410(A) provides:

Except as provided in this rule, a jury that decides a case must consist of 12 jurors. At any time before a verdict is returned, the parties may stipulate with the court's consent to have the case decided by a jury consisting of a specified number of jurors less than 12. On being informed of the parties' willingness to stipulate, the court must personally advise the defendant of the right to have the case decided by a jury consisting of 12 jurors. By addressing the defendant personally, the court must ascertain that the defendant understands the right and that the defendant voluntarily chooses to give up that right as provided in the stipulation. If the court finds that the requirements for a valid waiver have been satisfied, the court may accept the stipulation. Even if the requirements for a valid waiver have been satisfied, the court may, in the interest of justice, refuse to accept a stipulation, but it must state its reasons for doing so on the record. The stipulation and procedure described in this subrule must take place in open court and a verbatim record must be made.

Under this court rule, in order for a waiver of the right to a 12-person jury to be valid, the trial court must personally advise the defendant of that right and ensure that the defendant understandingly and voluntarily chooses to give up that right. Once the trial court finds that the requirements for a valid waiver have been satisfied, the court may accept the parties' stipulation to accept a verdict from less than 12 jurors. MCR 6.410(A).

During deliberations, Juror No. 2, who was pregnant, advised the court that her pregnancy condition prevented her from continuing with deliberations. The trial court agreed that it was necessary to excuse the juror. The parties discussed different options for addressing the situation, which included (1) granting a mistrial, (2) calling an alternate juror and having the jury begin deliberations anew, or (3) having the parties agree to allowing the jury to proceed with deliberations and accepting a verdict from an 11-member jury. The prosecutor and defense counsel both agreed to accept a verdict from an 11-member jury. It is clear from the record, however, that the trial court never personally questioned defendant to advise him personally of his right to a verdict from a 12-person jury and to determine that he was understandingly and voluntarily waiving that right. Thus, there was no valid waiver of defendant's right to a 12-person jury. *People v Cook*, 285 Mich App 420, 424; 776 NW2d 164 (2009). Accordingly, defendant has established a plain error.

However, because this issue is unpreserved, defendant is not entitled to relief unless he can demonstrate that the error "affected the outcome, and that it resulted in the conviction of an actually innocent person or seriously affected the fairness, integrity or public reputation of judicial proceedings." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) (quotation marks and citation omitted).

Although defendant recites the plain-error standard of review, he does not apply a plain-error analysis to the error that occurred in this case. Rather, defendant relies solely on the fact that a valid waiver of his right to a 12-person jury was not obtained. This is sufficient to satisfy the plain-error prong, but defendant fails to explain how the plain error affected the outcome of the case, resulted in the conviction of an actually innocent person, or seriously affected the fairness or integrity of the judicial proceedings where both parties agreed to accept a verdict from only 11 jurors. Although defendant argues that it would have been permissible to recall the alternate juror to replace the excused juror, the parties and the trial court expressly discussed and considered that option, in addition to considering the option of a mistrial, but they agreed instead to allow the jury to continue deliberating with only 11 jurors and accept a verdict from a jury of 11. Because the parties both agreed to this procedure, and defendant has not otherwise satisfied the requirements for relief under plain-error review, reversal is not required.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that he was denied the effective assistance of counsel because trial counsel failed to review all discovery materials and was unaware of defendant's statements in his prior recorded police interview, which the prosecutor used to impeach defendant's trial testimony. We disagree.

Because defendant did not raise this ineffective-assistance claim in a motion for a new trial or request for a *Ginther*[1] hearing, our review of this issue is limited to errors apparent from the record. "To establish ineffective assistance of counsel, defendant must show (1) that trial counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted." *People v Jackson*, 292 Mich App 583, 600-601; 808 NW2d 541 (2011). In examining whether trial counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

During defendant's testimony, defendant denied knowing Reynolds, knowing that Reynolds had a dog, and knowing that Reynolds sold marijuana. On cross-examination, the prosecutor impeached defendant's testimony with defendant's statements made during a prior recorded police interview in which defendant admitted knowing Reynolds and knowing that Reynolds's house was a drug house, and that he had previously purchased marijuana from Reynolds. Defense counsel subsequently moved for a mistrial, arguing that he was misled into believing that defendant had not made any statements to the police. According to defense counsel,

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

he received a document from the prosecution in which the word "refused" was written on a signature line to indicate that defendant refused to provide a statement. The prosecutor explained that defendant had actually been interviewed by the police for several hours, which was recorded, but before his statements were reduced to writing, defendant invoked his right to remain silent, and "refused" was written on the signature line to indicate that defendant refused to give a *written* statement. The prosecutor maintained that all copies of defendant's recorded interview were provided to defense counsel, who admittedly did not review the recording because he believed that defendant had not given a statement. The trial court denied defendant's motion for a mistrial, faulting defendant for not advising counsel that he had spoken to the police.

Defendant now frames this issue as an ineffective assistance of counsel claim, arguing that counsel was unprepared for trial because he did not review defendant's recorded interview before defendant testified, which resulted in defendant providing testimony at trial that was inconsistent with his police statements. Therefore, defendant's asserted error is not one of trial strategy, but of preparedness. "When asserting ineffective assistance of counsel premised on counsel's unpreparedness, a defendant must demonstrate prejudice resulting from the lack of preparation." *People v Bosca*, 310 Mich App 1, 37; 871 NW2d 307 (2015), rev'd in part on other grounds 509 Mich 851 (2022).

In *People v Frazier*, 478 Mich 231, 244; 733 NW2d 713 (2007), the defendant misled counsel and counsel acted in reliance on facts that the defendant had communicated to him, which was inconsistent with what the defendant had previously told the police. *Id*. Our Supreme Court agreed that "[i]f defendant had given counsel the same version of events that he furnished the police, counsel would most likely have advised defendant differently," but concluded that "counsel cannot be faulted for advising defendant on the facts defendant had communicated to him." *Id*.

Similarly, in this case, defendant's testimony at trial contradicted what he previously told the police. Defendant would have been aware that he spoke to the police, but there is no indication in the record that defendant informed defense counsel that he had spoken to the police for several hours before he invoked his right to remain silent. Although defendant asserts that he did not remember what he told the police when he talked to them in January 2018, defendant does not claim that he did not remember ever speaking to the police and he does not assert that he informed defense counsel that he had previously spoken to the police. Defense counsel relied on a document that indicated that defendant refused to make a *written* statement, which defense counsel apparently understood as indicating that defendant did not make a statement at all, written or oral. Had defendant mentioned that he spoke to the police for several hours, even if he did not remember what he said, it would have been unreasonable for counsel not to follow up to determine what defendant may have said. However, it is not apparent from the record that defendant ever advised counsel of his interview with the police, and defendant does not contend otherwise. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Counsel cannot be found ineffective for failing to pursue information that his client neglected to tell him. *People v McGhee*, 268 Mich App 600, 626; 709 NW2d 595 (2005). Because there is no indication that defendant made his police interview known to defense counsel, we cannot conclude that counsel was ineffective for having failed to discover that defendant previously spoke to the police and advising him of the impact of his prior statements on any testimony he planned to give.

## IV.  UNAVAILABLE WITNESS

Defendant next argues that the trial court erred by allowing the prosecution to introduce Felder's prior testimony at defendant's second trial.  Defendant argues that the testimony was not admissible because the prosecution did not exercise due diligence to locate and produce Felder for trial.  We disagree.

This Court generally reviews a trial court's decision to admit evidence for an abuse of discretion, *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017), but constitutional questions, such as those concerning the right of confrontation, are reviewed de novo, *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011).  A trial court's determination of due diligence is also reviewed for an abuse of discretion.  *People v Eccles*, 260 Mich App 379, 389; 677 NW2d 76 (2004).  A court abuses its discretion when its decision falls "outside the range of principled outcomes." *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014).  This Court reviews any factual findings for clear error.  *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009).

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . .to be confronted with the witnesses against him[.]"  US Const, Am VI.  This right to confrontation applies to the states through the Due Process Clause of the Fourteenth Amendment.  *Pointer v Texas*, 380 US 400, 406; 85 S Ct 1065; 13 L Ed 2d 923 (1965).  "Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony."  *Garland*, 286 Mich App at 7.  Defendant challenges the trial court's determination that Felder was an unavailable witness.

Unavailability includes a situation in which a declarant is absent from a trial or hearing and, in a criminal case, due diligence is shown.  MRE 804(a)(5).  Due diligence is established by the prosecution's "attempt to do everything reasonable, not everything possible, to obtain the presence of a witness." *Eccles*, 260 Mich App at 391.  When inquiring into the reasonableness of the attempt, the trial court must ask "whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *People v James (After Remand)*, 192 Mich App 568, 571; 481 NW2d 715 (1992).

Approximately a month before trial, the prosecution learned that Felder lived in Texas.  The prosecutor immediately moved for the issuance of a subpoenas for an out-of-state witness, which was approved, and then sent the subpoena via e-mail to the Harris County Prosecutor's Office in Houston.  The Harris County Prosecutor's office attempted to contact Felder by phone and by visiting his last known address to personally serve him with the subpoena.  An investigator visited Felder's last known address in Houston three times a day for several consecutive days, and also called Felder's last known phone number several times and left voicemails, but was unsuccessful in locating or making contact with Felder.  The Harris County Prosecutor believed that Felder was still in Houston because Felder had pawned video games there in February 2022, using the same Texas address that the investigator visited.  The prosecutor in this case also repeatedly attempted to contact Felder by telephone.  A male voice answered the first call, but as soon as the prosecutor identified herself, the male hung up the phone and did not respond to any additional phone calls.

At the time of defendant's first trial in March 2018, Felder was living with his father at an address on Norwood Street in Detroit, and the prosecutor had no issues producing Felder for trial. The trial court instructed the prosecutor to again investigate that address before defendant's second trial. The officer in charge went there and spoke to Felder's stepmother, who reported that she had not spoken to Felder for two years and, although she knew he was living out of state, she did not know the state where he was living and did not have any other contact information. The officer did not get any information regarding Felder's father.

Defendant cites several cases in which either the Michigan Supreme Court or this Court found that the prosecution failed to exercise due diligence to locate and produce a witness. However, "[w]hether the prosecution made a diligent, good-faith effort to produce missing witnesses is an evaluation that depends on the particular facts of each case." *People v Dye*, 431 Mich 58, 67; 427 NW2d 501 (1988). Considering the record in this case, the trial court did not err by finding that the prosecution made diligent, good-faith efforts to locate and produce Felder at trial. Accordingly, the trial court did not err by admitting his prior testimony.

## V. SENTENCING

Defendant, who was 19 years old at the time of the offenses, argues that his mandatory life-without-parole sentence for his felony-murder conviction should be held unconstitutional under our Michigan Supreme Court's decision in *Parks*, 510 Mich 225, and he should be resentenced in accordance with the same individualized statutory sentencing procedure available for juvenile offenders who are convicted of first-degree murder. We disagree.

In *Parks*, the Michigan Supreme Court held "that mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole violates the principle of proportionality derived from the Michigan Constitution, . . . and thus constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16." *Parks*, 510 Mich at 268. Since *Parks* was decided, this Court has addressed whether *Parks* may be applied to 19-year-old offenders, *People v Czarnecki (On Remand; On Reconsideration)*, ___ Mich App ___; ___ NW3d ___ (2023) (Docket No. 348732), lv pending, and 21-year-old offenders, *People v Adamowicz (On Second Remand)*, ___ Mich App ___; ___ NW3d ___ (2023) (Docket No. 330612), convicted of first-degree murder and sentenced to mandatory life without parole.

In *Czarnecki*, this Court, on remand, considered "whether the defendant's mandatory sentence of life without parole for a murder committed at the age of 19 is cruel or unusual punishment under Const. 1963, art 1 § 16." *Czarnecki*, ___ Mich App at ___; slip op at 1. This Court noted that before our Supreme Court decided *Parks*, it had upheld the "constitutionality of a sentence of life without parole for a defendant convicted of felony murder, expressly rejecting the defendant's argument that such a sentence constitutes cruel or unusual punishment under Const 1963, art 1 § 16" in *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976). *Czarnecki*, ___ Mich App at ___; slip op at 2. This Court further observed that, in *Parks*, the Supreme Court specifically stated that its holding "does not affect *Hall*'s holding as to those older than 18." *Czarnecki*, ___ Mich App at ___; slip op at 2, quoting *Parks*, 510 Mich at 255 n 9. Accordingly, this Court held that "*Hall*'s holding continues to apply to those older than 18." *Czarnecki*, ___ Mich App at ___; slip op at 2. This Court further stated that "[t]his understanding of *Parks* and *Hall* is consistent with this Court's recent decision in *Adamowicz (On Second Remand)*, where this

Court held that *Hall* compelled the conclusion that subjecting a 21-year-old defendant to a mandatory sentence of life without the possibility of parole did not constitute cruel or unusual punishment under the Michigan Constitution." *Czarnecki*, ___ Mich App at ___; slip op at 2.

We are bound to follow this Court's decision in *Czarnecki*. Accordingly, we reject defendant's argument that his mandatory life-without-parole sentence for felony murder is unconstitutionally cruel or unusual.

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ David H. Sawyer